Case number 16-5150, Texas Neighborhood Services Appellant v. United States Department of Health and Human Services et al. Ms. Rosenblatt for the appellant, Mr. Kolsky for the appellees. Good morning, your honors. My name is Alexandra Rosenblatt, and I'm here with my colleagues Edward Waters and Christopher Brezina. We represent Texas Neighborhood Services, or TNS, which operated a Head Start grant near Dallas, Texas, for over 40 years. The Departmental Appeals Board acted arbitrarily, capriciously, and contrary to law when it disallowed over 700 incentive payments, which totaled more than $1.3 million. Specifically, the Board, one, applied the wrong legal standard to evaluate whether the payments were reasonable. Two, violated a fundamental norm of administrative law to treat like cases alike when it refused to remand the case for further development of the record. And three, raised an evolving list of complaints, which turned the burden of proof into an impossible standard. As to reasonableness, the cost principle provides that an incentive payment is allowable if total compensation paid to an individual is reasonable. In turn, total compensation paid to an individual is reasonable if it is comparable to wages or similar work in the grantee's labor market. TNS produced a wage comparability study, which is basically an analysis of comparable wages in TNS's labor market. The study showed that the majority of TNS's employees were paid total compensation, including their incentive compensation, that was within the range of comparable wages. The cost principle is not at all concerned with the timing of compensation. It's concerned only with the amount. When the Board analyzed the percentage of aggregate and individual compensation that was paid as an incentive, the Board evaluated the wrong factors, and that's arbitrary. Even if the percentage of compensation paid as an incentive were relevant, the record contains only conclusory statements, no evidence. As a result, there's no rational connection between the facts in the record and the conclusions that the Board drew, and that is also arbitrary. When it refused to remand the incentive payments to the agency, the Board treated TNS differently than it treated CFIRD, another Head Start grantee. In CFIRD Community Action Agency, as in this case, the Board found that CFIRD had failed to prove that some of its incentive payments complied with its policy. Instead of disallowing those payments, as the Board did here, the Board remanded the case to the agency to, quote, give CFIRD an opportunity to prove to ACF, close quote, that it had complied with its own policy. And this remand makes sense for a couple of reasons. First, the Board's purpose is to review final decisions of the agency. The Board is not an auditor in the first instance. When the Board itself identified further questions that weren't part of the agency's final decision, the Board should have remanded the disallowance so that the agency could revise its final decision. Second, as the Board recognized in CFIRD, the grantee, as employer, is the best judge of its own compensation policies. And the agency must take into account the autonomy of a grantee to determine what expenditures it should make. The Board raises new questions about the payments that weren't in the initial disallowance decision, and it says, without evidence or explanation, we think these look arbitrary. But then it refused to remand it so that T&S could develop that evidence and explanation. And that is ignoring important evidence, in fact, the most important evidence, as the Board itself has held, and that's arbitrary. The Board offers contradictory rationales for treating T&S differently than it did CFIRD. In its decision on the motion for reconsideration, the Board said that the basis for the disallowance in CFIRD was that the grantee lacked a policy, and that's just factually incorrect. On the first page of the CFIRD decision, it said this disallowance is ACF saying we cannot tell whether the payments complied with CFIRD's written bonus policy, and that's exactly what happened here. Even if the Board were correct, that distinction doesn't justify why you should treat it differently. The distinction is that the record is missing evidence from the grantee about the incentive payments, and it's missing that evidence because it wasn't on notice it had to produce that evidence. These are new arguments raised by the Board for the first time in its decision. Do you want to say something about your last point about the changing standards? Yes. At every step in this proceeding, the agency and the Board moved the goalposts. The audit finding and the disallowance were premised on allegedly missing plans of performance, which was the result, as the district court itself acknowledged, of a misinterpretation of the policy. The disallowance also cited a lack of documentation to indicate which employees received which grades and how much they were paid. So in response to that final decision of the agency, T&S produces or argues that this was a misreading of the policy, and two, here are the charts that show which employees received which grades and how much they were paid. Then the agency gets up and says, well, we want to see performance evaluations. Well, you're skipping a step, which is that I think they looked at the charts and they did not really compute. There was a need for explanation. Given the policy, one with a higher grade would get a higher bonus, and people with lower grades got higher bonuses, and it was just an inference that the chart supported that it was not in fact the result of a consistent application of the policy. And the Neighborhood Services was on notice of that and given an opportunity to explain that and did not satisfactorily explain that in the board's view. Well, Texas Neighborhood Service wasn't on notice. That arbitrariness was not raised by the agency in briefing before the DAB or in its initial disallowance. That was not the basis of the agency's final decision. Instead, the board raises these issues sua sponte, and when TNS says, and the board even acknowledges, without further evidence or explanation from the grantee, we can't tell whether these arbitrary payments comply with the policy. And TNS says, okay, remand it, and let's go through this. There are over 700 incentive payments here, and to go through that record, we need a remand so that the agency can revise its disallowance to comply or revise its final decision. So by that you mean disallow only the incentive payments that it thought didn't meet the policy. Right, and that's correct, Your Honor, and to also allow the grantee to explain why some payments appeared arbitrary. But maybe in fact aren't. That's correct, Your Honor. So I'm sort of surprised about that. Maybe this is an extra record question. When I looked at your briefs and the government's briefs, I mean, if you're right about this, you know, you've raised some pretty serious points. Is there something going on here that's not in the briefs or the record? Could you have an explanation for why Texas was treated this way? Is there something happening that we're missing? Sure. In Seaford, the board starts out by saying, look, it's important to point out that incentive payments are not per se unreasonable. And I think that what we're- Aren't they, I mean, excuse me, aren't they permitted? Exactly, but I think that the board felt like it needed to remind the agency that paying these incentive payments is not unreasonable. And I think when you get here, there's that sense, again, that somehow we shouldn't be using federal grant money to pay these people. But really, a lot of these people were making below the reasonable range of their salaries in the first place. And under your client's standards, incentive payments can only be made if the operation for the year has been below budget, right? That's absolutely correct. And so there are several purposes for the incentive policy. One is that a grantee doesn't have money for unexpected expenses. It basically has what it budgeted for. And so in order to be fiscally prudent, it encourages its employees to spend conservatively. And then if they need a rainy day fund, they have it. But if they don't need that rainy day fund, those can be paid to the employees. And it's a way to bump up their salaries without giving a permanent wage increase that they may not have money for the following year. Isn't it the case that the record shows that in 2010, everyone got the same incentive payment? And how could that be an incentive payment? Okay, so I think incentive payments can be based on cost reduction. So it can be an incentive to constrain costs and to spend conservatively. But beyond that, you know, we really haven't pushed for the 2010 payments in our brief. And we're asking for a remand. And on remand, we would be focused on the 2011 and 2012 payments because those did differ based on employee rankings. You argue that there should be a person-by-person review. And, I mean, already it feels like there's a lot of micromanaging here. I mean, there must be a lot of federal grants like this. And the notion that there can be no disallowance if it looks like the system is just not a legitimate system or not being applied legitimately, that they would have to go through with you and pick through every single employee, that just doesn't seem that workable to me. Right. So I want to back up. And there's a version of that argument that works in your favor, too, which is why are they micromanaging even to this point? Exactly. But I'll also back up and say federal grantees are an open book. And auditors come in, and they have total access to our books and records. And they came in in this case, and they didn't say, well, these payments are arbitrary or you don't have the performance evaluation or the disciplinary record. The auditors came in and said, you're missing your plans of performance, and we don't know what grade was associated with which employee. Well, just to push back on that a little bit, you assign four different bands, and you say we're going to grade people accordingly, and then you have a year when you don't appear to apply that whatsoever. And then you have other years where the payments are more individuated, but they appear to crisscross your own criteria. You don't come forward initially, you, your client, don't come forward initially with an explanation of what this is about, criteria for why something that looks really quite inconsistent with the plan isn't that consistent. And so you can see why if they want to be looking, but they also don't want to be looking at every stitch, that the decision might be, no, guys, you haven't met your burden to document. Right. And the burden, we have met our burden of proof as to at least some of the documents. I think that, or some of the incentive payments. But beyond that, the agency itself has decided that line by line looking at the incentive payments is not unworkable. In CFER, that's exactly what they did. They went line by line with the incentive payments. And the ones that were disallowed, the one that was disallowed, they disallowed. The allowable ones, they allowed. And then ones where they couldn't tell, you know, we think the grantee may have an argument here, we're not sure. Agency, go back and take a look at it. So I think that the agency has agreed that an individual line by line analysis is appropriate. And it's important because federal grantees have federal money, and they make expenditures in reliance on the cost principles. And when you disallow allowable costs, so let's say there are allowable costs caught up with some potentially suspect payments, then you're basically enacting a penalty, levying a penalty. Now, doesn't that have to be your burden, though, to come forward and say, I mean, it's questioned the consistency of your application of your plan. It's questioned the question whether you're using a matrix. And you need to give comfort that we don't have to go into every little stitch because here's our logic. Here's the final grid showing how we applied it. And it all computes. And the fact that you didn't do that, you know, it's like, oh, then you want another chance and another chance and another chance. I mean, you could say, come on down, you know, look further. But they want you to provide something where it all adds up at a medium general level. And then they can say, okay, we're comfortable and go away. And if you say, no, we're going to just sort of give you a bunch of stuff that looks really inconsistent and that doesn't follow our published plan. And if you're not happy with that, then come on down and sit and visit with us. That's a little bit of a hard way to administer a federal grant program. I don't know that I agree that the charts look crazy. I mean, if you look at the 2011 charts, within the specific categories of who they are, like Head Start teachers, they're pretty consistent. Within Head Start teachers, the As get whatever, the Bs get whatever. But that's the kind of explanation that we could have offered. And I think it should be and that we would offer on remand. I mean, and the point is that this issue wasn't raised until the board's decision. The agency did not complain about the inconsistency of the payments, other than 2010, any prior at all. And so when we ask for a remand, I mean, and it also differs from what the agency's final decision was. Well, in their brief to the board, I believe it's in their brief to the board, they talked about the failure to provide adequate documentation and said that the plan had not been implemented consistently. And that, for example, they rewarded employees with C grades. It's not consistent with the policy where the stated objective is to reward people with exemplary performance. So there was the type of issue that we're debating now about was the logic of the plan borne out by the matrices. That issue was raised before the board's decision, wasn't it? I agree that they were raising issues as to whether discrete payments violated the policy. And, you know, the TNS could have made some kind of decision that, look, these payments may not have complied with the policy, we're willing to concede those. But there's a vast majority of payments here that did comply. And as to the documentation, we provided the exact documentation that the disallowance asked for. And then we provided it. And then they said provide the personnel evaluations. We provided it. And then the next thing we turn around and they're questioning something else. And that may be okay, but we need an opportunity to be able to respond. Okay. Thank you. May it please the Court, I'm Josh Kolsky and I represent the appellees in this matter. This Court should uphold the board's decision because TNS failed to meet its burden to show that its incentive compensation payments were adequately documented, made pursuant to its compensation plan, and reasonable. During the initial monitoring review, TNS told the agency that the relevant documentation, which it described as plans of performance, that's not from the agency, it said the relevant documentation was missing and unable to be located. And at that time it provided only a two-page scoring matrix to substantiate its more than $1.3 million in incentive payments. Now after the agency issued its monitoring report, TNS had an opportunity to correct the deficiencies that the agency had found, but failed to do so. So the agency issued the disallowance letter, again noting the lack of documentation. Then, on appeal to the board, TNS provided only summary spreadsheets to justify the over $1.3 million in incentive payments. Where was the earliest place where the agency made clear precisely what type of documentation was being sought? I think I would answer that by saying that the agency can't specify particular types of documents. It wasn't able to specify, you know, you need to produce all of your forms 51, because that's not how it works. It's the grantee's policy. They drafted the policy. They produce documentation when they presumably apply the policy. They know what documentation they maintain. So the agency isn't able to come in and say, we need all of your X, Y, Z reports. But at the time, and again, initially, the grantee provided no documentation other than a two-page scoring matrix. But their point is, I think their argument is, is that once they responded with these spreadsheets which showed exactly what the original letter said was missing, that the agency changed the rules and it said that's not enough. You need to have performance evaluations. And then they say, okay, here are performance evaluations. The board said that wasn't enough, that it needed disciplinary records and discretionary points. In other words, their argument is that every step of the way they provided what was asked for and then the response was, well, that's not enough. That's their argument. It's like a moving target. And there's only so much specificity that the agency can provide when they're not getting information from TNS. No, that's not the point. The point is that when they responded with information that the agency wanted, instead of saying, okay, this is the information, the agency said, well, this is not enough, we need more. And they did that at each step of the way. And then in the end, when they said, well, okay, reconsider it so we can respond to this, the agency said no. That's their argument. On the reconsideration issue, I would urge the court to look at TNS's motion for reconsideration for the board. It's in the joint appendix. And it says very little about a remand. It just says that the board should have remanded to the extent that there were allowable and unallowable payments. It doesn't say, if you remand, we can show you this. It doesn't say, we have these documents which we will produce on remand. It doesn't say, in fact, it doesn't even argue that they can explain the inconsistencies. It doesn't say, you know, you would think if there were some good explanation for these inconsistencies that they would have argued in the motion for reconsideration. They would have said, you know what, board, you found what appear to be inconsistencies. We have a good explanation for that. This is it. And if you remand, we can provide documents to support that. But go back to this other point. So the original letter just said we can't tell who's getting these and how much they are, right? And when you got all that, when the agency got all that information, it kept saying, like, for example, when they gave these sample evaluations, the board, again, demanded something that the original letter had not asked for, which is disciplinary records and these discretionary points. And, Your Honor, and that's because... Why is that? That is because of the next to nothing was produced initially. And as information was produced by TNS, then the agency could be more specific. So as the, Your Honor mentioned the performance evaluations. Those are identified in the 2007 policy. So once that policy was produced, the agency looked at it and said, well, your own policy says you need to keep performance evaluations on file in order to make these payments. And so why haven't you produced those? In response, with a reply brief to the board, TNS produced evaluations for one employee. Now, performance evaluations were only one of several factors that went into the ratings. And there was no documentation produced or proffered as to these other factors. So, again, I think they characterized it as escalating demands for documentation. That's because they were producing new information, which was allowing the agency to be more specific at times. And raising new questions, I gather. Rather than resolving all the questions, they seemed to raise new questions in an iterative process. I mean, I think this is tough because, on the one hand, this is federal money. On the other hand, these are employee bonuses, which, you know, the documentation for which, at least in my limited experience in and out of government, tends to be rather limited. They're somewhat discretionary. Criteria are put out. Somebody in an evaluative position makes a call, and the bonus gets paid. So, you know, and it also seems like it might be an area in which guidance would be helpful from the agency. You know, you don't want this to become a slush fund and a source of corruption, obviously, and we respect that that's why you're here. On the other hand, these are early learning centers, are they not? I mean, this is some of the lowest paid people in the economy, and they don't have sophisticated personnel offices, I'm guessing. And so, you know, some kind of guidance on what would suffice, how to keep the records, and, you know, what to produce might forestall this, no? I think I would contrast this case with an industry, a highly regulated industry.  And in a different industry, there may be regulations that say, you know, as to particular policies, every entity has to have the same policy, and there have to be specific record-keeping requirements for everyone in the regulated, every one of the regulated entities. This is different. The grantees have the freedom to draft their own policy. There are requirements that they keep adequate documentation to justify their costs, but it's really, you know, it's incumbent upon them to know what documentation they have because it's their policy. It's not that the agency is saying this is the policy. But do you really want every employee's individual performance appraisal, or do you want a number, a column on their grid that says, you know, yes or no, discipline in the past whatever it was, 90 days, you know, ultimate qualitative bottom line of performance appraisal? I mean, maybe if they had a matrix that was better calibrated to their policy and the apparent inconsistencies of which were explained, you'd be happy, no? Well, I understand Your Honor's point, and I think I would respond by saying it depends on probably the stage of the administrative process. So certainly at the initial audit, I'm not saying that they would have had to produce every single performance evaluation. I'm sure that sampling would be appropriate at that point and maybe some summary of the payments, assuming there were no inconsistencies. But once they say our records are missing and unable to be located, then, yes, they do have to produce the record. So you're saying that this is a situation in which you went in, somebody physically went in and sat down with people and said we need to look at your records? Yeah, the ACF monitoring report describes interviews with the CFO about the compensation. And it just really raised alarms, and that's why the process becomes more formalized, and that's why the extent of documentation that's demanded is more detailed. And that's correct. And not only was there the initial monitoring review, but that report states that the grantee had 120 days to correct the deficiencies after that. They certainly could have provided documentation then. If they weren't sure what to provide, they could have gone to ACF and said, you know what, it turns out we do have documents. What would you like to see? They didn't do that, and that's why the disallowance letter was issued. And then they had another opportunity with their briefs to the board where they could have provided additional documentation, and that's when they provided the summary spreadsheets. The board looked at it and said, well, these show these inconsistencies. They don't show compliance with your policy. They show noncompliance with the policy, and there's no source documentation. Issues were pointed out by ACF. Well, see, the point about the source documentation is that that was a new request. I don't think that was a new request. No one had asked us for that before. Well, they hadn't specifically used the term source documentation, although board precedent does say once a cost is questioned as lacking documentation, it's the responsibility of the grantee to provide source documentation. So it shouldn't have come as any surprise to TNS. Would you oppose a remand for them to provide documentation, and if they fully provided documentation to ACF satisfaction, would that end the matter? We would oppose. We do oppose a remand, and there needs to be finality to the administrative process. And also— Well, it would be over after that. It would, but it would also be futile because for the first time in this litigation, in TNS's appellate briefs to this court, we see their apparent justification for these inconsistencies. What they say is they imply that some positions have an unreasonably low or a usually low base salary that certain positions are inherently difficult and also tough to fill. And they suggest that that's the reason for the inconsistencies. The problem with that, if that's their explanation, that's not consistent with the policy either. If they were paying people higher incentive payments because of a position's inherent difficulty, that's not spelled out in the policy. So if that's what they would show on remand, that would be futile. There's no reason to go through that exercise. Okay. Thank you. Thanks. Did Ms. Rosenblatt have any more time? Okay. You can take two minutes. Thank you, Your Honors. I'd like to respond just to the last point that what we offered as potential explanations is not consistent with our policy. Our policy had two goals. One was to reward superior performance, and the other was to ensure that we had comparable wages. So for people who had inappropriately low base compensation, increasing their pay with a one-time bump was completely consistent with the policy. Also, I want to make it clear that when the auditors come in and look at our records, we don't say a bunch of documents are missing. We say the plans of performance are missing because there's a misunderstanding of what they're asking for, and that's what the auditors base their disallowance on. There isn't any such thing as plans of performance, is there? That's exactly right, and that was the problem, is that they were asking for plans. We don't know what they're talking about, and we say, well, I guess we don't have the plans of performance. And then that's the basis for the disallowance. And when we disprove that, then it should be sent back. Because, really, we flipped the process on its head. The process is that the auditor comes in. They are paging through documents, looking through files to see what's going on. They make the basis for the disallowance. The board, then, is just looking to see whether the auditor's got it right or not. The board is not itself paging through thousands of documents. And lastly, I'll just say that this is federal money, but there is a standard that keeps these payments reasonable, and that is, are they within the reasonable range? Now, isn't your position that that's kind of a safe harbor, that if they're within a reasonable range, case closed or not? Well, it is in the sense that, to the extent that the agency was using the completely wrong standard, then that's overwhelming evidence that the decision was arbitrary. Because the cost principle says this is what you look at, and the agency refused to abide by that cost principle. And is it that your position that's sort of an independent basis for a demand that they were pushing aside the general compliance with the standard composition and comparable jobs? Yes, that it was arbitrary for them to ignore the standard. And, you know, I want us to keep in mind that the initial reason that we're all here today, the district court found was inaccurate. There are no plans of performance. And to require the T&S, then, to come in and disprove every single thing, no matter how many times it changes or whether we have notice of it, is simply a burden of proof that is an impossible standard, and that is arbitrary. Okay. Thank you. Case is submitted.
judges: Tatel, Pillard, Wilkins